# Staunton.

E. C. MILLER AND R. H. GRAHAM v. QUINN M. HARLESS, BY ETC.

September 19, 1929.

Absent, West, J.

The opinion states the case.

*H. C. Tyler* and *Hall & Buford*, for the plaintiffs in error.

*Harless & Colhoun* and *John B. Spiers*, for the defendant in error.

PRENTIS, C. J., delivered the opinion of the court.

The defendants in the trial court are here complaining of a judgment against them in favor of Quinn M. Harless, in an action for an alleged false arrest. In order to comprehend the legal questions involved, it is necessary to state in some detail the substance of the testimony relied upon by both the plaintiff and the defendants, because one of the assignments of error is that nearly all of that offered for the defendants was excluded.

This is the substance of the testimony relied upon by the plaintiff: Quinn M. Harless, at the time of the arrest seventeen years old, and John Hawley, at that time about twenty years old, went from their homes in Christiansburg to Blacksburg for the purpose of attending the parade of the new cadets, 'which in the college vernacular is called the "Rat Parade," which usually occurs at the Virginia Polytechnic· Institute shortly after the beginning of each session. This parade did not occur as was anticipated on that afternoon, but there was another attraction, a football game, played with a rival college at the athletic grounds. When the plaintiff arrived in Blacksburg, he went upon the college premises with a friend. They met one of the students and after being together for a short period, the three went to the north gate of the athletic field, where the ticket office is maintained, which is also the principal entrance to the athletic field. When

the three reached this entrance, two of them went in, leaving the plaintiff at the gate. Plaintiff was then joined by John Hawley and James Haymaker, and Haymaker went in to the game, leaving the plaintiff and Hawley together at the gate. It is claimed by the plaintiff and Hawley that the plaintiff did not intend to go to the game, and that Hawley, while he wished to go, did not have the money to pay the admission fee. They claim that when Haymaker went in to the game, it was arranged that he would get from his father a sufficient sum of money for Hawley in order to pay his admission fee, and that he would meet Hawley at the south gate for the purpose of delivering the money to him. The plaintiff agreed to go with Hawley to the south gate, because told that if he did not get the money to pay his admission to the game he would return with the plaintiff to Christiansburg. They had no definite plan as to their method of getting back to Christiansburg, but expected to find some friend going in that direction who would carry them. It does not appear what became of Haymaker, but plaintiff and Hawley testified that before leaving the north gate they told the keeper there that they wanted to go to the south gate for the purpose indicated, and asked him if there would be any objection to their going around the fence to the south gate, and he replied that there was none. They claim that they started to go from the north gate to the south gate and that they went around the east fence, and that although the football game was then in progress they did not stop or even look at the game, and that when they reached a point near the south gate they were arrested by the defendant, officer Graham, who acted under the direction of the defendant, Miller.

It is necessary then to review the testimony relied

upon by the defendants, because the chief assignments of error are based upon the rulings of the court in refusing to admit nearly all of this testimony offered for and by the dfendants, and in refusing to give the jury any instructions based thereon.

The defendant, Miller, is the business manager of the Virginia Polytechnic Institute, and as such has charge of the grounds and buildings, required to see that the premises are properly policed, and that the property is not injured by persons who come into the grounds. Upon the occasions of athletic games, he arranges to have a number of special officers stationed in and around the field to preserve order, to prevent trespass, and to prevent persons from going to high places just outside of the athletic grounds where the games and other events can be observed without paying the required admission fees. On this occasion, an officer, Sisson, was on duty on the west side of the athletic grounds at a point about two-thirds of the way south of the north end of the grounds. He testified that the plaintiff and Hawley came along, and that he asked them if they knew they were trespassing, and they said that they wanted to go to the south gate to see some one or to get a ticket. He told them that they could go on, but that there was another officer stationed above him nearer the south gate. Hall, this other officer, was offered to testify that he saw the plaintiff and Hawley on the west side of the grounds, near the south gate, looking at the ball game, and that he told them that he had orders to keep anybody from trespassing; that he turned them back and they went in the direction of the north gate. It does not appear that they told this officer that they wanted to go to the south gate to meet some one or to get a ticket. When turned back by this officer, they went in the

direction of the point where the officer, Sisson, was stationed. He testified that they came back fifteen or twenty minutes after they first passed him, and that he told them they would have to move on. Officer Sisson testified that a short time thereafter he saw some one's head sticking up on a little knoll above him; that he went up there and found the plaintiff and John Hawley sitting down in the alfalfa field where they were in plain view of the ball game. He told them that he would have to arrest them, and, on their promise to leave, let them go. Shufflebarger was stationed inside the athletic field near the north gate. He saw the plaintiff and Hawley outside of the fence west of and near the north gate, and later saw them on a hill looking at the ball game. He ordered them to leave, and they went on around the east fence in the direction of the south gate. Shufflebarger then called the defendant Miller's attention to the two boys, telling him that they were watching the game from the outside. After they had been ordered to leave the point where Shufflebarger saw them observing the game, another officer, Oliver, saw them on the east side of the fence, in the alfalfa field, looking at the ball game through the fence. He directed them to move on, and they left that position. Defendant, Miller, who was on the inside of the athletic grounds, had the plaintiff and Hawley pointed out to him by Shufflebarger, who told him that they had been looking at the game from the outside, and that he had ordered them to move on and not to trespass. Miller then followed the plaintiff and Hawley as they went around the east fence. He testified that when they reached a high point they stopped and looked at the ball game for about five minutes, and that he ordered them to move on and not to trespass. They then went further south and

again stopped and looked at the ball game through the fence for another period of about five minutes. When they were at this point, he saw officer Oliver apparently saying something to them, and they moved on until they reached a high point near the south gate and took a position there; that he then approached them and warned them that if they did not get off the premises and discontinue trespassing they would be arrested. They then went to a cinder roadway that runs from a driveway through the college grounds to the south gate of the athletic grounds, and followed this cinder roadway to the point where it intersects one of the main roads through the college grounds. When they reached this main roadway they turned to the right and went in the direction of high ground from which they could again have seen the ball game. When they started in this direction, the defendant, Miller, ordered the officer, Graham, to arrest them, but says that had they turned to the left and gone in the direction of Blacksburg, instead of turning to the right as they did, he would not have ordered their arrest. The officer, Graham, who actually arrested the boys, as directed by Miller, was stationed in the roadway south of the south gate of the athletic grounds. He first observed the plaintiff and Hawley when they were some distance north of the south gate, coming through the alfalfa field. He testified that the boys were walking through the alfalfa field, and that the defendant, Miller, was following them, and that Miller called to him to arrest them, that they had been trespassing; that he arrested the boys, intending to take them before the mayor of Blacksburg; that he thought he would have to take them without assistance, and not knowing who they were or anything about them he ran his hands over the outside of their clothing to see if they had any con-

cealed weapons; that he then put handcuffs on them to prevent them from escaping, and placed them in the back of his car. Before they started, however, the suggestion was made that officer Oliver should accompany him, and that defendant, Miller, said Oliver could be spared and that it would be all right for him to go along with Graham to the mayor's office. Soon after they started to the mayor's office the boys told Graham and Oliver who they were and asked them to take off the handcuffs, which they agreed to do as soon as they got to a suitable place to stop the car for that purpose; and that before they reached the town the car was stopped and the handcuffs were removed. As they passed along the main street of Blacksburg, the boys observed a Mr. Blount, from Christiansburg, and signalled or called to him to follow them. He did so, and when they reached the mayor's office, the mayor not being there, Blount said to Graham that he would be responsible for them until five o'clock that afternoon, at which time the mayor had left word he would return to his office. They were thereupon released, stated that they wished to return to the athletic grounds for the purpose of seeing the ball game. Graham took them back in his car to the point near the athletic grounds where they had been arrested. When they got out of the car they were told by Graham that they could not loiter around on the grounds and that they would have to move on. At five o'clock, defendants, Miller and Graham and the other officers who had witnessed the trespass, went to the mayor's office. Upon reaching there they were informed by the mayor that plaintiff and Hawley had already been there and because no one had appeared against them, he had discharged them and told them to go on home, or something of that import. This was the end of the

prosecution so far as the defendants or any of the college authorities were concerned.

Subsequently, two actions were brought, one by Hawley and the other by the plaintiff. The declarations alleged that they had been arrested and imprisoned and deprived of their liberty without any reasonable or probable cause.

From the beginning of the trial, the plaintiff objected to any reference by the defendants' attorney to any circumstance that preceded the actual arrest of the plaintiff. This objection was made while the attorney for the defendants was making his opening statement, and the court then determined to limit the evidence to such occurrences as defendants, Miller and Graham, personally saw or heard. Similar objections were repeated during the trial, upon the offer of testimony which was excluded, upon the completion of the testimony by motion to exclude the testimony for the defendants which had been admitted, and similar rulings were made. An instruction was given to the jury directing them specifically to "disregard and not to consider" any evidence in the case of any occurrence prior to the time of the defendant Miller's order to defendant Graham to arrest the plaintiff, except the fact that the defendant, Miller, was the business manager of the Virginia Polytechnic Institute, and had charge of the place, and that defendant Graham was a prohibition officer and a special officer of Montgomery county. Finally, during the course of the argument, when the attorney for defendants attempted to review the evidence and to point out to the jury the testimony which had been excluded under the court's ruling, with a view, as he claimed, of leading up to and discussing the evidence that could properly be taken into consideration by the jury under the court's ruling, objec-

tion was made to this method of argument, and the court refused to permit defendants' counsel to refer to the evidence which had been excluded.

There was a verdict in favor of the plaintiff for $800.00, which the trial court refused to disturb.

There are four assignments of error:

1. That the court erred in refusing to admit, and in refusing to allow the jury to consider, the evidence showing the conduct of the plaintiff and John Hawley from the time they went upon the Virginia Polytechnic Institute grounds until they were arrested.

2. The second, which presents substantially the same legal proposition, is that the court erred in refusing to admit evidence as to the information upon which the defendant, Miller, acted in ordering the arrest of the plaintiff and John Hawley.

It seems to us that the bare statement of these claims by defendants is of itself sufficient to convince the impartial mind that these errors are well assigned. There can be no proper understanding of this case without the proof of the circumstances which immediately preceded and caused the arrest. The contrary view is based upon the contention, so confidently made, that the arrest was illegal because the officer had no warrant at the time. It must be conceded that if the plaintiff was guilty of a misdemeanor, which the officer witnessed, he had authority to arrest without a warrant; but it is claimed that because Miller said that he would not have directed the arrest if the plaintiff and Hawley had not indicated their purpose to repeat the trespass by going in the direction in which they could easily do so unless they were escorted or followed by one or more officers to prevent its repetition; and that the officer said that he would not have arrested them unless Miller had told him to do so,

that therefore they were not arrested for the continuing trespass immediately preceding, which the officer saw.

This contention may be plausible but it is clearly unsound. The officer (defendant) who arrested them saw them just before the arrest while they were in the alfalfa field treading down and injuring the crop, then almost ready to be harvested. That this was a trespass there can be no doubt whatever; and that the officer would not have arrested them therefor unless they had indicated by their conduct their purpose to repeat the trespass is a fact, but this is quite insufficient to show that the arrest was illegal. This disinclination to arrest was only a continuance of the consideration which had been shown the plaintiff repeatedly theretofore during the afternoon. That both Miller and the officer were perfectly willing, if not indeed anxious, to avoid arresting either of them, should they then abandon their previous persistence in wrongdoing, and contemptuous disregard of requests and warnings not to trespass and proceed toward Blacksburg, is apparent from this testimony, if true. This, however, does not justify the conclusion that they were illegally arrested simply because at that time they were walking along the private road and were not trespassing at the precise moment of the arrest. The defendants had seen the actual trespass but were not bound to arrest for it. The trespass which the officer saw was not condoned, however, and did not cease to be a trespass merely because the plaintiff had then reached the road. Of course, it could not be said that had they been actually fleeing from the officers and had reached such a place, the officer could not there arrest as for a misdemeanor just previously committed in his presence, simply because when he overtook them they were not actually trespassing. If the evidence offered by the defendants

be true, the plaintiff was arrested for the last of a continuous trespass, or the latest of a series of trespasses, witnessed by officer Graham.

■ In considering the question of the exclusion of the evidence as to what transpired immediately before an arrest, the case of *Beckwith* v. *Bean*, 98 U. S. 266, 25 L. Ed. 125, is instructive. It appeared there that an officer of the United States army caused the arrest of a person, without a warrant, under a military order for aiding and abetting enlisted soldiers to desert, and was afterwards sued by the person so arrested for false imprisonment in causing such arrest, and it was held that every fact which tended to show the motives of such officer in causing the arrest, or to show the existence of the grounds assigned for the arrest is admissible in such action in mitigation of damages, although such facts may not establish legal justification. Citing several cases in the course of the opinion in which the rule seems to have been applied to cases in which the plaintiff was seeking to recover punitive damages. It is insisted in this case that the rule there referred to cannot apply because there was no effort to recover punitive damages in this case. This reason as applied to the facts of this particular case is specious rather than sound, for while it is true that the plaintiff here did not ask for any instruction as to punitive damages, it is nevertheless manifest that his recovery is largely based upon the indignity which he suffered because the officer placed handcuffs upon him, as he claims, so unnecessarily and unjustifiably. The amount of the recovery, $800.00, is clear enough evidence that although the jury were not authorized to impose punitive damages, they have in fact done so, for the amount is greatly in excess of any actual damage which the plaintiff has suffered.

Every reason, therefore, which so clearly would have applied had the plaintiff asked for punitive damages applies under the peculiar facts of this case, in which the jury has awarded damages doubtless much greater in amount than would have been allowed had they heard or been permitted to consider the testimony offered for and in behalf of the defendants, all of which tended to show either justification, explanation or palliation.

The exclusion of this testimony was erroneous and harmful to the defendants. It follows that the instruction to the jury to disregard all evidence of any of the occurrences prior to the order of the defendant, Miller, to the defendant, officer Graham, to arrest the plaintiff, which justified, excused or explained the arrest, emphasized and repeated that error.

■■ 3. The third assignment of error is that the court erred in admitting evidence of the general reputation of the plaintiff for truth and veracity.

The subject is discussed by Burks, J., the elder, in *George* v. *Pilcher*, 28 Gratt. (69 Va.) 312, 26 Am. Rep. 350. After showing that in many of the American States it is held that such evidence is admissible only when the general character of the witness, or his character for truthfulness, is assailed by direct evidence as to such character, or by proof on cross-examination of extrinsic facts showing his general character, and that it cannot be received to sustain a witness on account of inconsistency in his own statements on cross-examination, or on account of statements proved to have been made by him out of court contradictory of the statements made by him in court, or on account of proof by other witnesses of material facts irreconcilable with the facts proved by the witness, although such proof may impute fraud or falsehood to

the witness. He then shows that in other States a more liberal rule is applied, and that in some States, whenever the character of the witness for truth is attacked in any way, it is competent for the party calling him to give general evidence in support of the good character of the witness for truth. He concludes his careful treatment of the question thus: "We are not aware that the precise question passed upon by these decisions has ever come before this court for determination until now, and in the condition of authorities in other States we are called upon to declare the true rule in Virginia; and we are of opinion that whenever the character of a witness for truth is attacked, either by direct evidence of want of truth, or by cross-examination, or by proof of contradictory statements, in regard to the material facts, or by disproving by other witnesses the material facts stated by him in his examination; or in general, whenever his character for truth is impeached in any way known to the law, the party calling him may sustain him by evidence of his general reputation for truth. The rule, as we declare it, has, we believe, been generally regarded as the true rule by the bench and bar in this State, and has been generally followed in the practice."

We concur in this view of this question, and hold that under the circumstances here shown the testimony offered to support the general reputation of the plaintiff for truth and veracity was admissible. The court committed no error in permitting its introduction.

That this liberal rule should not be further extended is well illustrated by the refusal to admit such testimony in *Reynolds* v. *Richmond & M. Ry. Co.*, 92 Va. 404, 23 S. E. 770. The question is the subject of an instructive note to *Woods* v. *Thrower* (116 S. C. 165, 107 S. E. 250), 15 A. L. R. 1065.

4. The fourth assignment of error grows out of the refusal of the court to give instructions "F" and "G" offered for the defendants. These instructions read:

"F. The court instructs the jury that if they shall believe from the evidence that the plaintiff went upon the grounds of the Virginia Polytechnic Institute outside of the established walkways and driveways, and after being warned to leave said grounds and not trespass thereon, he went from place to place on said grounds and continued to knowingly and wilfully trespass on said grounds, outside of the established walkways and driveways, then the plaintiff for committing such trespasses, after being warned, was guilty of a misdemeanor for which he was liable to a fine as provided by law.

"G. The court instructs the jury that if they shall believe from the evidence that the plaintiff went upon the grounds of the Virginia Polytechnic Institute outside of the established walkways and driveways and after being warned to leave said grounds and not to trespass thereon, he went from place to place on said grounds and continued to trespass thereon, and that the plaintiff in committing such trespass injured or destroyed property of any value, either real or personal, he was guilty of a misdemeanor for which he was liable to a fine as provided by law."

■ . It is observed that the substance of instruction "F" is, that if the plaintiff went upon the grounds of the Virginia Polytechnic Institute outside of the established walkways and driveways, and after being warned to leave the grounds and not trespass thereon, went from place to place thereon and continued to knowingly and wilfully trespass on the grounds outside of the established walkways and driveways, then the plaintiff was guilty of a misdemeanor for which he was

liable to a fine as provided by law. The basis of this instruction is Code of 1919, section 3338, as amended by Acts 1922, page 208, chapter 123, which among other things provides that if any person, after being warned not to do so by the owner or tenant of any premises, shall go upon the lands of the said owner or tenant, he shall, in addition to the liabilities imposed under this section, be deemed guilty of a misdemeanor.

Instruction "G" was based upon Code 1919, section 4479, also enacted for the punishment of unlawful trespassing on land as a misdemeanor. That section, as amended, Acts 1914, page 498, among other things, provides that "if any person, unlawfully, but not feloniously, take and carry away, or destroy, deface, or injure any property, real or personal, not his own," he shall be fined not less than five nor more than five hundred dollars.

In addition to this, Code 1924, section 864, referring to the powers and duties of the board of visitors of the Virginia Polytechnic Institute, specifically provides that they shall have power "to prohibit entrance to said property of undesirable and disorderly persons, or to eject said persons from said property, and to prosecute under the laws of the State trespassers and persons committing offenses on said property."

These statutes, which are clear enough in their meaning, determine this question. Both of these instructions should have been given, and, in our opinion, no extended discussion of this proposition is necessary. Moreover, even were it true, as contended for the plaintiff, that neither of these statutes could be applied under the facts of this case, nevertheless, if the plaintiff wilfully and contumaciously refused to leave the premises after being requested and directed to do so,

and went into the field of growing alfalfa and trampled it down and injured it, this was a misdemeanor at common law.

It is true that a mere trespass upon real or personal property, which is also the subject of a civil action, is not always a crime at common law; but it is a crime at common law if it amounts to a breach of the peace, or if it tends to or threatens a breach of the peace.

The cases are collected in a note to Brill's Cyclopedia of Criminal Law, section 962, page 1531. The only Virginia cases cited there are *Commonwealth* v. *Powell*, 8 Leigh (35 Va.) 719, in which it was held that, as the law then stood, it was not a crime to cut down and carry off a line tree; and *Henderson* v. *Commonwealth*, 8 Gratt. (49 Va.) 708, 56 Am. Dec. 160, in which it was held that though it was not a misdemeanor to break into and enter the close of another, yet if that entry is attended by circumstances constituting a breach of the peace, it will become a misdemeanor for which an indictment will lie; and that the going upon the porch of another's house armed, and from thence shooting and killing a dog of the owner of the house, lying in the yard, in the absence of the male members of the family, and to the terror and alarm of females in the house, is a misdemeanor for which an indictment will lie.

The rule which we have just stated applies to the facts of this case. The conduct of the plaintiff and his companion, if the evidence offered for the defendants is true, was exasperating, tended to violence and a breach of the peace, and hence was a misdemeanor at common law for which they were liable to arrest.

It follows from what we have said that we are of opinion that the judgment should be reversed, and the case remanded for a new trial, to be had according to law.

*Reversed.*