**W. H. REEVES, d/b/a Reeves TV & Appliance, Appellant,**

v.

**David MELTON and Shirley Melton, Appellees.**

**No. 46207.**

Court of Appeals of Oklahoma, Division No. 1.

Dec. 18, 1973.

Released for Publication by Order of Court of Appeals Jan. 10, 1974.

Covington, Gibbon & Poe by Richard D. Gibbon, Tulsa, for appellant.

Elmore A. Page, Tulsa, for appellees.

ROMANG, Judge:

This is a suit for replevin of a combination stereo record player and television set which had been sold by plaintiff's salesman, Gil, to Shirley Melton on April 22, 1970, and which had been delivered to her home on the same date. Plaintiff alleged that there was a balance due of $669.45 after allowance for a trade-in that was made. The set was picked up under the replevin proceeding and was in the possession of the plaintiff at the time of trial.

Defendants, David Melton and Shirley Melton, claim that Mrs. Melton paid for the set in full with cash at the time the set was delivered, and they filed an answer and cross-petition alleging payment and further alleging that Mrs. Melton had been maliciously harassed, threatened and intimidated by the plaintiff and his employees who were claiming that she had not made payment, and defendants further specifically alleged as follows:

"Said defendant, Shirley Melton, states that as a result of the acts and conduct of said plaintiff and its agents, servants or employees, she suffered great and excruciating mental fear and anguish, and humiliation and shame.

"WHEREFORE, premises considered, defendants pray judgment against said plaintiff, for mental pain and suffering in the sum of $5,000.00; and for judgment in the sum of $5,000.00, as punitive damages for the unlawful and wilful trespass upon their private property; and for any other and further relief that

the Court may deem just and proper, under the circumstances."

Trial was had before a jury which returned a verdict for defendants on their cross-petition in the amount of $1,500.00 for actual damages, the amount of $5,000.00 for punitive damages, and for possession and ownership of the set. The parties had agreed in advance in the presence of the trial judge, that the prevailing side should receive an attorney fee in the amount of $450.00, and therefore judgment was rendered accordingly.

Reference will hereinafter be made to the parties as they appeared in the trial court or by name.

 Plaintiff has appealed from the order overruling his motion for new trial and presents three propositions. The first is:

"The court committed fundamental error in submitting to the jury a question of damages for mental suffering, unaccompanied by physical injury."

In Pacific Mut. Life Ins. Co. of Calif. v. Tetirick, 185 Okl. 37, 89 P.2d 774 (1939), the trial court judgment was reversed because of an erroneous instruction, but in a specially concurring opinion by Justice Davison, which was concurred in by Justice Osborn, and which was also concurred in by Justice Hurst as to liability, the question at hand was discussed. In said specially concurring opinion is the following:

"As I interpret the term 'contemporaneous physical injury' it may include such an injury as the plaintiff in the present case is alleged to have received. Partly responsible for this view is the recognition that a 'physical injury' may be an injury to the nervous system as well as an injury to the bones or muscles. I also recognize that such an injury may be immediate and direct or 'contemporaneous' even though the objective symptoms and ultimate results thereof may not appear until long afterwards and as observed by a layman might seem purely consequential and remote. These natural facts have long been recognized by medical science and have gained some recognition by the courts. For instance, in Kimberly v. Howland, 143 N.C. 398, 55 S.E. 778, 7 L.R.A., N.S., 545, the court said [page 780]: 'We think the general principles of the law of torts support a right of action for physical injuries resulting from negligence, whether willful or otherwise, none the less strongly because the physical injury consists of a wrecked nervous system instead of lacerated limbs. Injuries of the former class are frequently more painful and enduring than those of the latter.'

&ast; &ast; &ast; &ast; &ast; &ast;

". . . I believe it must be conceded that physical injury may result from the emotions and that a wide array of injuries ranging from minor nervous disorders to fatal attacks of illness such as is commonly referred to as 'heart failure' may be conveyed to the human body 'from without' through the nerves or the senses of sight and hearing as well as through physical contact, as where a blow is struck. These truths are very clearly and intelligently dealt with in the following quotation from Sloane v. Southern California Railway Co., 111 Cal. 668, 44 P. 320, 322, 32 L.R.A. 193: 'The real question presented by the objections and exception of the appellant is whether the subsequent nervous disturbance of the plaintiff was a suffering of the body or of the mind. The interdependence of the mind and body is in many respects so close that it is impossible to distinguish their respective influence upon each other. It must be conceded that a nervous shock or paroxysm, or a disturbance of the nervous system, is distinct from mental anguish, and falls within the physiological, rather than the psychological, branch of the human organism. It is a matter of general knowledge that an attack of a sudden fright, or an exposure to imminent peril, has produced in individuals a complete change in their nervous system, and rendered one who was physically strong and vigorous weak and timid. Such a result

must be regarded as an injury to the body rather than to the mind, even though the mind be at the same time injuriously affected. Whatever may be the influence by which the nervous system is affected, its action under that influence is entirely distinct from the mental process which is set in motion by the brain. The nerves and nerve centers of the body are a part of the physical system, and are not only susceptible of lesion from external causes, but are also liable to be weakened and destroyed from causes primarily acting upon the mind. If these nerves, or the entire nervous system, are thus affected, there is a physical injury thereby produced; and, if the primal cause of this injury is tortious, it is immaterial whether it is direct, as by a blow, or indirect, through some action upon the mind.'

"In my opinion, the foregoing considerations furnish a substantial basis for deciding that injuries to the nervous system are 'physical' and that recovery may be had therefor as for other physical injuries. I therefore conclude that one who suffers such injuries may recover damages for the resulting detriment against another who is legally responsible therefor.

\*　\*　\*　\*　\*　\*

". . . In some jurisdictions, trespass has been held to include conduct reasonably calculated to 'lead to' or 'threaten' a breach of the peace. See Freeman v. General Motors Acceptance Corp., 205 N.C. 257, 171 S.E. 63; Miller et al. v. Harless, 153 Va. 228, 149 S.E. 619; Engle v. Simmons, 148 Ala. 92, 41 So. 1023, 7 L.R.A.,N.S., 96, 121 Am.St.Rep. 59, 12 Ann.Cas. 740. And a disturbance of the 'peaceful and quiet enjoyment' of the home has been definitely recognized as an invasion of right and a distinct trespass in itself. See Disheroon et al. v. Brock, 213 Ala. 637, 105 So. 899; Patapsco Loan Co. of Baltimore City et al. v. Hobbs, supra; [129 Md. 9, 98 A. 239] Continental Casualty Co. v. Garrett, 173

Miss. 676, 161 So. 753. Where the cause of action in tort arises out of the commission of a wrong or an act that is unlawful in itself, it need not be proved that the defendant intended to do injury thereby, for every man is presumed to know the law and to intend the legal consequences of his acts. See Roe et al. v. Lundstrom et al., 89 Utah 520, 57 P.2d 1128, and the authorities cited in Engle v. Simmons, supra, as well as Barbee v. Reese, 60 Miss. 906, 908. And in such cases proof of pecuniary loss is also unnecessary."

The testimony relevant to an understanding of the instant case, is briefly as follows:

Mrs. Melton testified that when the combination stereo and television set was delivered to her house by two of plaintiff's employees, she laid on top of the stereo for payment, six one hundred dollar bills, three twenty dollar bills and one ten dollar bill, and that one of the employees took the money.

Mrs. Melton further testified that the salesman, Gil, telephoned some time later on April 22, 1970, and talked to her husband; that she telephoned Gil on the morning of April 23, 1970, at which time he told her that they had not received the money; that when she told him about how she paid, he said he would check with the delivery men and call her back; that he did call her back and said that the delivery men denied the receipt of any money; that the next she heard from the plaintiff was on Saturday morning, April 25, 1970, and in this regard she testified as follows:

"A And I went in the kitchen and hooked up the little electric oven to fix breakfast, and there wasn't a sound. And all of a sudden the dogs started barking and sounded like someone banging on the door with a heavy object.

We all looked at each other, and pretty soon he said, 'Open the door, Martin.' And we still didn't say anything. I didn't know who it was.

And then pretty soon he said, 'Martin,' said, 'I hear you in there. You better open this goddamn door.' And he just kept banging on it and lunging against it. And he said, 'If you don't open this door,' he said, 'I am going to kill everyone of these goddamn dogs out here.'

So I reached up in the closet and got my shotgun and put my children in the bathroom. And he lunged against the door again, and when he did, the door lock gave just enough I could see daylight. And he didn't know it, so he closed the screendoor and went around the house knocking on all the windows. Well, I went to the phone and called the sheriff's department and told them that someone was trying to get in my house and I was going to have to shoot them if they didn't get someone out there. So then he had gone on around the corner of the house and met Mrs. Kammerzell, the people that farm land there. And he talked to her. And as they were leaving, well, my daughter peeked out—we still didn't know who it was. And my daughter peeked out the curtain and she saw it was Reeves TV truck. And then just a few minutes later the deputy came, and I thought it was them back and I wouldn't let him in. The dispatcher called me and told me who it was and to let him in.

\* \* \* \* \* \*

"Q (By Mr. Phillips) Then after this one time that you saw the Reeves truck, when was the next time you saw them?

A After that Saturday? I don't remember when it was, but on two different times I saw them come down the driveway and turn around and go out."

Mrs. Melton also testified:

"A I was scared. I was scared to go out. I was scared to get in my car and go anywhere. My children were afraid to go out in the yard and play because they were afraid of the men. My son said he was afraid the men would come back. And my daughter wouldn't walk down the driveway to catch the bus. I had to take her to school because she was afraid something would happen to her. And my husband would call me during the day to see if I was all right. I was just pretty scared."

Andy Reeves, a deputy sheriff, and a brother of the plaintiff, W. H. Reeves, testified that he went to the home of the Meltons in April, 1970, and that Everett Love and John McCormick, employees of plaintiff, were with him, and he further testified as shown by the transcript as follows:

"Q On this occasion what did you do?

A I went to the front door and knocked. Also to the back door and knocked.

Q Did anyone respond?

A No, sir.

Q Did you have trouble with the dogs?

A Yes, sir.

\* \* \* \* \* \*

"Q What did you do?

A I told them who I was. I'd like to talk to the party of the house, Melton.

Q Who did you state that you were?

A I told them I was Andy Reeves, deputy sheriff.

Q All right. Did you go to the back door?

A Yes, sir.

Q Did you knock on the back door?

A Yes sir.

Q Did you holler at the back door?

A I didn't holler. I stated my name and I'd like to talk to them.

\* \* \* \* \* \*

"Q Did you knock on the windows?

A No, sir."

Thus the two different versions of the same event. The Melton daughter testified as to the event as follows:

"A A little while after we had been up somebody come to the door and started banging on it. And he—they just kept on banging on it. And then finally he said, 'Open up the door.' He was calling us 'Martin. Open up the door, Martin.' And he kept banging on it harder and harder. And he hollered, 'Open up this damn door, Martin.'

It scared us. We didn't know who or what it was. He was saying, 'Open up in the name of the law.' And we were scared to death. We didn't know what it was.

And then he said, 'Open up this damn door before I kill everyone of these damn dogs.' And it scared my mother, and she got the shotgun out of the closet. Well, she sent me and my—let's see. He started going around banging on the windows to the back door. And my mother sent us to the bathroom. And he went around banging on the windows, and he was even banging on the bathroom window, and he come back around. He was lunging at the door, sounded like. And it kind of come open where you could kind of see daylight. And, let's see. I don't exactly remember what happened after that, but I know—

Q Did you ever look outside?

A Yes. Everything quit and I peeked out the window.

Q What did you see, if anything?

A It was a blue truck going down the driveway.

Q Did you see any writing on it?

A It was a Reeves TV truck."

Mrs. Kammerzell, wife of the man who farmed the ten acres where the Melton house was located, testified that the Melton house set back one-half block from the street, and that the property was posted.

From our review of the record we conclude that there was competent evidence to sustain a finding of a breach of the peace and to also sustain a finding of trespass to the premises.

It is undisputed that Deputy Sheriff Reeves was acting in behalf of W. H. Reeves, and that he had no warrant or other legal authorization for going onto the premises of the Meltons.

In 1948 the Restatement of Torts was amended to recognize as a separate tort, the intentional infliction of mental distress. Section 46 of the Restatement of Torts 2d, reads in part as follows:

"§ 46. Outrageous Conduct Causing Severe Emotional Distress

"(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."

The comments following Section 46, read in part as follows:

" . . . It is only within recent years that the rule stated in this Section has been fully recognized as a separate and distinct basis of tort liability, without the presence of the elements necessary to any other tort, such as assault, battery, false imprisonment, trespass to land, or the like.

\* \* \* \* \* \*

"h. Court and jury. It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.

\* \* \* \* \* \*

"j. Severe emotional distress. The rule stated in this Section applies only where

the emotional distress has in fact result-ed, and where it is severe. Emotional distress passes under various names, such as mental suffering, mental an-guish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrass-ment, anger, chagrin, disappointment, worry, and nausea. It is only where it is extreme that the liability arises . . . ."

We are of the opinion that the evidence herein is sufficient to support a finding of intentional infliction of extreme mental distress.

▌ In view of all of the foregoing, plaintiff's first proposition is hereby de-nied.

Plaintiff's second proposition reads as follows:

"The court committed reversible error by its instructions to the jury, and in failing properly to instruct on the fundamental issues."

The Journal Entry of Judgment in the instant case contains the following:

"The Trial Court then held a recess and called counsel for both parties into her chambers to discuss the instructions. After considerable discussion, pertaining to such instructions by the Court and by the respective counsels, the instructions were finally agreed upon by the parties."

The plaintiff did not request any instruc-tion that was refused, and the plaintiff did not except to any instruction that was giv-en. Also, plaintiff's motion for new trial makes no mention of the trial court's in-structions.

12 O.S. 1971, § 991 provides as follows:

"(b) If a motion for a new trial be filed and a new trial be denied, the mov-ant may not, on the appeal, raise allega-tions of error that were available to him at the time of the filing of his motion for a new trial but were not therein as-serted."

In Pittman v. Oklahoma Natural Gas Co., 205 Okl. 371, 237 P.2d 1016 (1951), the court syllabus states:

"In order to bring up for review to this court the instructions of the trial court, exceptions thereto must be saved' in the manner prescribed by statute, and the error in giving the same must be as-signed in the motion for a new trial, oth-erwise, the assignment of error presents no question for review."

This court has reviewed the instructions of the trial court and finds no fundamental error therein.

Alleged errors pertaining to the court's instructions, have not been properly pre-served for review, and therefore present no question for review.

Plaintiff's third and final proposition reads as follows:

"This jury verdict was the direct result of erroneous and prejudicial question-ing and conduct by appellee's counsel, re-sulting in a gross miscarriage of justice."

▌ Plaintiff complains of misconduct of defendants' counsel in questioning Mrs. Melton about an anonymous, threatening telephone call. We find that all of plain-tiff's objections to such testimony were sustained by the trial court, and that the jury was admonished to disregard it. No failure of the jury to observe that admoni-tion has been shown.

▌ Plaintiff also complains that after Mr. Love testified that he did not need any legal papers with him to deliver the televi-sion set, that defendants' counsel comment-ed as follows:

"MR. PAGE: Better have when you go there uninvited, I'll tell you. I have no further questions."

We note from the transcript of the trial that plaintiff made no objection to said comment at the time or at any other time until on this appeal.

Plaintiff complains of the following question that was asked Deputy Sheriff Reeves on cross-examination:

"Q You know that you have to have that (a search warrant) to go on another person's property unless you were invited, don't you?"

No objection was made at that time to the question, and we do not find it so highly prejudicial as to warrant a new trial.

Plaintiff also complains of defendants' counsel making further reference to the telephone calls in the following question:

"Q I see. Am I to understand, then, on top of the calls that you received after the twenty-fifth that the truck came on your—the Reeves truck came on your property on two different occasions before they came out and picked up the set by replevin?

A I don't remember—I believe it was after they picked up the set. Now, I'm not sure just exactly when it was."

The transcript reflects that no objection was made to either the question or the answer.

Plaintiff cites three cases under his third proposition, to-wit: (1) Yoast v. Sims, 122 Okl. 200, 253 P. 504 (1927), in which there was repeated mention of insurance, and opposing counsel made timely motions to discharge the jury and continue the case on account thereof; (2) Harrod v. Sanders, 137 Okl. 231, 278 P. 1102 (1929), in which there was misconduct on the part of counsel in repeatedly asking a question which the court had declared to be incompetent, and which under well-established rules of evidence, could not be proved even if true; and (3) Horany v. Paris, 369 P.2d 636 (Okl.1962), in which counsel injected into the case highly improper questions which had for their only purpose to reflect upon the character of the witness.

 In State v. Weaver, 297 P.2d 549 (Okl.1956), the court syllabus states:

"In order for misconduct of counsel in propounding certain questions to a witness to effect a reversal of the judgment, it must appear that substantial prejudice resulted therefrom, and that the jury were influenced thereby to the material detriment of the party complaining."

In our opinion plaintiff has failed to show substantial prejudice resulted from the asserted acts of misconduct of defendants' counsel.

We further point out that plaintiff never moved for a mistrial at any time during trial, and that misconduct of defendants' counsel was not asserted in his motion for new trial. We again call attention to 12 O.S.1971, § 991(b) which was first enacted in 1968, and which we interpret as being mandatory.

Affirmed.

BAILEY, P. J., and BOX, J., concur.