## Staunton

BERNACE BAUSELL v. COMMONWEALTH OF VIRGINIA.

September 19, 1935.

Present, All the Justices.

670

The opinion states the case.

*S. B. Campbell, Wilson, Burns & Wilson* and *T. F. Walker,* for the plaintiff in error.

*Abram P. Staples, Attorney-General,* and *Edwin H. Gibson, Assistant Attorney-General,* for the Commonwealth.

HUDGINS, J., delivered the opinion of the court.

Bernace Bausell, son of Henry F. Bausell, has been convicted of murder in the first degree and sent to prison for a term of thirty-two years.

On July 5, 1928, he married Virginia Cornett, the daughter of T. Eugene Cornett and his wife, Laura Clarke Cornett. At that time the Cornetts lived in Wythe county,

and the Bausells in Bristol. Upon his marriage Bernace took his wife to his father's home and continued to live there until the summer of 1932, when they went to Lebanon, the old home of the Bausells. They again lived in the same house, the father in one apartment and the son in another.

To this marriage two children were born, Jean and Anne. At the date of the homicide Jean was not quite three years old and Anne not quite one. Conditions at first appeared to have been fairly normal, but Mr. Cornett did not approve of the marriage and afterwards did not approve of the manner in which his daughter was supported by her husband, and told him so.

Virginia left her husband and her Lebanon home early in the summer of 1932, but at his request came back and lived with him for about two months, when she again left him, taking with her the younger child, Anne, and went to her father's home in Wythe county to stay. Jean was taken by her father on several occasions to visit her mother at the Cornett home. On January 7, 1934, the father took Jean again to visit her mother and stayed there until about nine o'clock at night. The mother asked him to let Jean stay with her for a while. He was unwilling to let her stay, and Virginia was unwilling to let her go. In this situation it is said that the father made threats to the effect that he was going to have Jean, or kill everyone who attempted to prevent him. He and the mother caught hold of the child, and each struggled for its possession. Mr. Cornett intervened, a fight followed, and Bausell was shot, receiving a flesh wound in his side. Cornett finally threw Bausell to the floor, and sat upon him until a near-by doctor was summoned. This doctor took Bausell to the railroad station at Rural Retreat, and left him there. He went to Bristol and to the hospital for treatment. Thereafter Henry Bausell attempted the role of peacemaker between his son and Virginia, the wife.

On Saturday, January 13, Henry and Bernace Bausell went to the Cornett home, arriving there between twelve and one o'clock. Both declared they went for peaceable purposes, but both were armed. The father went in first and talked to Mrs. Clarke, the grandmother of Virginia. She received him in the living room. He repeatedly asked for Virginia, but without avail. He returned to the car in which Bernace had remained and reported the situation to his son. He then took a dress which he had bought for Jean and they both went to the house. In the meantime Mrs. Eugene Cornett had taken her daughter Virginia and her grandchildren upstairs to Virginia's room, and on her way took from her own room a pistol, and gave it to her husband, who was in his daughter's room taking a bath.

Without detailing the evidence, suffice is to say that when father and son came into the house, Virginia, her two children, and Eugene Cornett were in the same room upstairs with the door locked. The accused and his father claim that while they were in the hall upstairs they heard Jean call to her father. Then the door was broken open by the Bausells, or one of them. Bernace Bausell entered and picked up his daughter Jean. Both heard Virginia state to Mr. Cornett, "Daddy, don't shoot." They then for the first time saw Cornett in a corner of the room with a pistol. Virginia stepped in front of her husband; Cornett fired; the Bausells returned the fire, and in the general shooting Virginia and Cornett were killed, and both Bernace and Henry Bausell were struck, but not fatally wounded. The Bausells and Cornett were people of some prominence. Reports of the shooting were carried in the local papers and widely discussed in that section of the State.

■ With this background, as might be expected, it was somewhat difficult to obtain a jury free of exception from the county of Wythe. A motion was made for a change of venue. The Commonwealth filed an answer to

the petition in support of the motion, and on this issue evidence was submitted to the court and the motion overruled. Inasmuch as this evidence is not made a part of the record, we cannot consider this assignment of error.

It appears that the accused was tried and acquitted for the killing of Virginia Cornett Bausell. To show somewhat the extent of the feeling against the accused, and the atmosphere in which the jury was selected, we quote the following statement made by N. J. Wright, a justice of the peace: "That one night around the 28th of April, 1934, shortly after Henry F. Bausell and Bernace Bausell were acquitted of the murder of Virginia Cornett Bausell, he (N. J. Wright) was attending a revival meeting at Cripple Creek, at which Rev. Sanders Boyer, of Fries, Grayson county, Virginia, was preaching to an audience of at least a hundred; that during his sermon he stated in effect, if not in exact words, that 'John Dillinger had offered to give himself up if they would try him in Wythe county; that a double murder was committed up here in the upper end of this county. It was as dirty a thing as ever took place and they have acquitted the murderers.' "

With this situation confronting the trial court it was imperative that it should have taken extraordinary care to secure a fair and impartial jury to try the case.

The record discloses that ten of the veniremen, who were finally accepted by the court, had neither formed nor expressed any opinion as to the guilt or innocence of the accused. The other ten stated, on their *voir dire,* that they had either expressed or formed an opinion, also stated that they could disregard that opinion and try the accused on the evidence introduced on the trial. Judge Prentis, in dealing with a similar situation in the case of *Parsons* v. *Commonwealth,* 138 Va. 764, 773, 121 S. E. 68, 70, said:

"If this talesman, out of his own consciousness and appreciation of the inquiry, had said affirmatively that the opinion which he had previously formed was hypothe-

tical, being only based upon alleged facts, and that it would in no wise interfere with him when he came to hear the evidence from the witnesses as to the actual facts, and that he felt, notwithstanding his opinion, that he could enter upon the service as a juror and disregard his previous opinion and let his deliberations depend upon the evidence heard in the court room, and that he felt he could give the prisoner a fair and impartial trial notwithstanding the opinion he had previously formed, then he would have been a competent juror. It is observed, however, that these qualifying facts did not emanate from him, but were suggested by the leading, argumentative, and persuasive questions which were addressed to him. All that he did was to assent thereto. We will go far to sustain the trial judges in their effort to select impartial jurors, because their task is frequently difficult, and exceptions are frequently frivolous. Sometimes it is made more difficult than it otherwise would be because the persons summoned desire to evade jury service. In such instances the conscience of the venireman should be probed, and, if notwithstanding his previous expressions of opinion based upon common rumor, he is nevertheless fair and unprejudiced, he should be accepted as qualified. The true test, however, lies in the mental attitude of the proposed juror, and the proof that he is impartial and fair should come from him, and not be based on his mere assent to persuasive suggestions."

In the case at bar the trial court not only propounded to the jurors, leading, argumentative, and persuasive questions, but in the presence of other prospective jurors, condemned in no uncertain terms several jurors for stating that the opinion held by them was so positive that they could not disregard it and go upon the jury with an impartial and unbiased mind.

In the examination by the court of W. R. Pettigrew, he made the following answers to the questions propounded:

"Q. Have you made up or expressed an opinion as to the guilt or innocence of the defendant?

"A. Yes, sir.

"Q. What did you base that opinion on?

"A. Newspapers.

"Q. Did you hear anybody discuss it?

"A. No, only around town.

"Q. Just general discussion?

"A. Yes, sir.

"Q. Do you know what the parties you heard discuss it knew about the case?

"A. No, sir.

"Q. Don't suppose you talked to the witnesses, those who know something about it?

"A. No, sir.

"Q. You were talking to people who just wanted to talk and landed on the Bausell case to talk?

"A. Yes, sir.

"Q. And do you know whether or not the newspaper had everything exactly correct, or whether the Editor was sworn?

"A. No, I don't know that the Editor was sworn.

"Q. Just read the newspaper?

"A. Yes, sir.

"Q. So you formed an opinion?

"A. Yes, sir.

"Q. If you are accepted as a juror, would you try it from that or the evidence of the case?

"A. It would have to be very different evidence from what I read if my opinion could be changed.

"Q. I just don't quite understand. Do you mean to tell me that you are so constituted that you could not go into this jury box with an open mind and try this case, or are you going to let what you think influence you in this trial?

"A. I don't believe I could.

"Court: *I would be ashamed to tell it. I believe these men are trying to get off of the jury. I can't conceive.*

*They are, to say the least, certainly not competent jurors or they couldn't do it.* (Italics supplied.)

"Witness stands aside."

The examination of John C. Martin on his *voir dire* was in part as follows:

"Q. Have you made up or expressed an opinion as to the guilt or innocence of the defendant?

"A. Yes, sir, I have.

"Q. On what was it based?

"A. From hearing people talk that visited the scene, and the newspaper.

"Q. If you are on the jury to try this defendant, would you try him according to what you read, or heard somebody say about it, or on the law and the evidence?

"A. It would have some bearing.

"Q. Do you mean to tell me that conscientiously?

"A. Yes, sir, I do.

"Q. You are not just trying to get off the jury?

"A. No, sir.

"Court: *I don't want you on the jury.*

"Witness stands aside."

The examination of Lee Umberger in part was as follows:

"Q. Have you made up or expressed an opinion as to the guilt or innocence of the defendant?

"A. No, sir; the only opinion I have expressed is that it is a deplorable tragedy.

"Q. Nothing wrong in that. I suppose you read the newspaper?

"A. Yes, sir.

"Q. And also heard people discuss the case?

"A. Yes, sir.

"Q. But from that you have not fixed any opinion in your mind as to what you would have done?

"A. No, sir.

"Q. *I think you are absolutely correct in that.* If you are accepted as a juror, and go into the jury box could

you give this man a fair and impartial trial?" (Italics supplied.)

In the examination of R. W. Moore is found the following:

"Q. Have you made up or expressed any opinion as to the guilt or innocence of the defendant?

"A. I have.

"Q. On what was it based?

"A. On newspapers.

"Q. Have you such an opinion that you could not discard it and give this man a fair trial according to the law and evidence?                                      \

"A. I have.

"Q. You have an opinion regardless of what the evidence might be, that opinion would still stay with you?

"A. I am afraid so.

"By the court: *Stand aside. His name ought to be taken out of the jury box, and all who make such answers ought to be taken out."* (Italics supplied.)

The following is a part of the examination of Charles Armontrout:

"Q. Have you made up or expressed any opinion as to the guilt or innocence of the defendant?

"A. No, sir.

"Q. Can you give him a fair and impartial trial, according to the law and the evidence?

"A. Yes, sir.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"By Mr. Campbell:

"Q. Have you talked with any of the people who were up here at the other trial?

"A. I have.   ·

"Q. Who were they, do you remember?

"A. Various ones.

"Q. In the place of business there?

"A. I heard it discussed.

"Q. Could you tell us any of them?

"A. Well, I don't know, practically every one in passing; I heard it discussed numerous—

"Q. Everybody that came into your place of business had something to say one way or the other?

"A. Yes.

"Q. You talked with them about it?

"A. Yes.

"Q. And you read about it in the paper?

"A. Yes, sir.

"Q. You did talk it over openly there, and some would say one thing and some another?

"A. Yes.

"Q. You took part in those discussions?

"A. I did.

"Q. And have you now in your own mind an opinion as to the guilt or innocence of this defendant?

"A. None but what can be changed by evidence.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"Q. But it would require evidence to change the opinion which you now have?

"A. Yes, sir.

"By the court: That is not what he told me. I want to question you further. Do you have such an opinion that you could not discard it and be governed by the evidence here in this case?

"A. I have not.

"By Mr. Campbell:

"Q. I understood you to say a minute ago that you had an opinion, and that it would take evidence to remove that opinion. Am I right in that?

"A. I have no fixed opinion.

"Q. You mean you haven't an opinion, or that you have an opinion which might be changed?

"A. Well, I don't know that I have any fixed opinion in the case.

"Q. You mean that the evidence might change your view?

"A. Yes, sir.

"Q. But it would take evidence to change it?

"A. It would take evidence.

"By the court: I don't know what you mean, Mr. Armontrout; one time you answer one way and one time another. Possibly you don't understand the point. The whole question in this case is, if you have an opinion that requires—that is, if you are going to carry that opinion into the jury box with you, you are not a competent juror. If you can discard that opinion and go into the jury box with a fair mind and determined to try this man, give him a fair trial, and be governed only by the evidence you hear—

"A. I can.

"Court: It looks like you are qualified on that, but if *you want to put the question in such a way to confuse him, Mr. Campbell, go ahead.*"

This remark of the court was not justified by the circumstances appearing in the record. The attorney for the accused was fully aware of the hostile feeling existing in the county against his client, and while his examination of the prospective jurors was extensive, he was seeking by fair means to obtain information as to the mental attitude of each. Most of his questions were short and clear, but searching. There was no evidence of any attempt to confuse the jurors. The remark of the court had the tendency to increase rather than decrease any hostile feeling existing, and to create in the minds of those present the belief that the attorney was endeavoring to retard, rather than aid the court, in obtaining an unbiased jury.

We find nothing in the examination of the jurors on their *voir dire* to indicate that any of them were seeking to evade jury service. Each appeared to be frankly stating to the court that he had read the account of the tragedy in the newspapers, had heard it discussed on numerous occasions, and naturally from these reports

had formed an opinion. One of the prospective jurors stated that he had talked to people who had visited the scene. Another had said that he had talked to a member of the jury who sat in the former case. At least four stated that they had heard some of the evidence during the former trial, and one stated that he had heard the whole argument made to the jury by the attorneys for the Commonwealth, and the defendant, on that trial. The unjustifiable comments of the court had a tendency to prevent other prospective jurors on their *voir dire* from frankly stating the degree of the opinion they had formed, previous to being summoned on the venire.

The right of persons accused of crime to be tried by a fair and impartial jury is fundamental. Where an intelligent person, when informed of the necessity of disregarding any previous opinion that he may have formed, based upon inaccurate reports of the crime, states without persuasion or coercion that he can disregard that opinion and confine his deliberation to the evidence produced at the trial, he is a qualified juror under modern decisions of this court. See *Ballard* v. *Commonwealth,* 149 Va. 377, 140 S. E. 116; *Cox* v. *Commonwealth,* 140 Va. 513, 125 S. E. 139; *McCue* v. *Commonwealth,* 103 Va. 870, 49 S. E. 623. But when this statement is made in answer to persuasive and argumentative questions we have held, as in the Parsons case, that such a juror is not qualified. In the case at bar the trial court not only used leading, argumentative and persuasive questions, to the prospective jurors, but expressed its approval when one juror stated that the opinion so formed was not fixed, and in at least four other cases expressed its condemnation of jurors who simply stated that they were "afraid," or that they "did not think," they could disregard the opinion previously formed or expressed.

As stated by Judge Prentis, the true test of impartiality lies in the mental attitude of the proposed juror, and the proof that he is impartial and fair should come

from him uninfluenced by persuasion or coercion by any one, least of all by the trial judge, who is charged with the duty of remaining impartial himself, and seeing that the panel is composed of impartial and unbiased men.

██ ██ We are satisfied from the above that the jurors obtained in this case were not fair and impartial within the meaning of that term as used in the Constitution. As further evidence that the true state of mind of some of the jurors was not fully revealed on their *voir dire,* we turn to the affidavits filed on the motion to set aside the verdict. We do not refer to these for the purpose of considering that motion, but to show how fixed and positive were the opinions held by the jurors named, at the time they were examined on their *voir dire.* R. K. Hamilton made an affidavit that Ben Kelly, prior to being summoned, remarked to him, "there is a bunch summoned on that jury, me and my brother and Crowgey, that are hard boiled, but I believe Stuart Campgell will cut us off." James A. Brown stated that Ben Kelly had stated to him between the first and second trials "that he believed the defendant was guilty and should be punished, or words to that effect." Millard Shelton stated "that on the ninth day of May, 1934, he was shearing sheep at L. J. Crowgey's, whereupon the following conversation took place: "I (affiant) asked L. J. Crowgey, 'How do you think the next Bausell trial will go?' to which he replied, 'I don't know. They ought to be electrocuted.' I asked him why they ought to be electrocuted, but he made no answer." Alonzo M. Killinger said that R. S. Ewald, one of the jurors, stated to him in a conversation which took place shortly after the first trial, "that his mind was made up that the Bausells were guilty and that nothing could change his mind on this." See opinion delivered by Judge Gregory in the case of *Winn* v. *Commonwealth,* 160 Va. 918, 168 S. E. 351, 353, where it is said, "Where a juror has prejudged the guilt of an accused, before hearing the sworn testimony, it cannot be said that the accused has had a fair and impartial trial."

The mandatory provision of section 8 of the Bill of Rights is that, "In criminal prosecutions a man hath a right * * * to a speedy trial by an impartial jury of his vicinage without whose unanimous consent he cannot be found guilty." Having reached the conclusion that the jury, impaneled in this case was not impartial, it becomes our duty to set the verdict aside and remand the case for a new trial; so that an impartial jury may not only pass upon his guilt or innocence, but fix his punishment within the limits prescribed by statute. Upon a plea of not guilty, to an indictment charging a felony, there is no other legal tribunal clothed with the power of fixing the punishment.

Henry Bausell's and his son's account of the shooting, and the incidents immediately preceding, are in conflict with the testimony introduced by the Commonwealth. Under these circumstances the accused offered to introduce evidence tending to show the reputation of Henry Bausell, for truth and veracity, and his general good reputation as a peaceful, law-abiding citizen, which evidence was rejected by the trial court, and this constitutes one of the assignments of error.

The rule as to the introduction of evidence on truth and veracity is stated in *George* v. *Pilcher,* 28 Gratt. (69 Va.) 299, 26 Am. Rep. 350, thus: "Whenever the character of a witness for truth is attacked either by direct evidence of want of truth, or by cross-examination, or by proof of contradictory statements in regard to the material facts, or by disproving by other witnesses material facts stated by him in his examination; or, in general, whenever his character for truth is impeached in any way known to the law, the party calling him may sustain him by evidence of his general reputation for truth." See also, *Miller* v. *Harless,* 153 Va. 228, 149 S. E. 619.

While in this particular case, only Bernace Bausell was on trial, his guilt or innocence to a large degree depended upon whether the jury considered his father guilty or innocent; and indeed, the court, at the instance of the

Commonwealth, instructed the jury that if they believed a certain state of facts then each was responsible for the act of the other. Under the circumstances of this case the refusal to admit the introduction of this evidence constitutes reversible error.

The indictment was drawn substantially as authorized by Code, section 4865. The accused contends it is not sufficient to support a verdict of murder in the first degree, and under this form of indictment it was error to have given instruction number one, which stated that if the jury believed from the evidence, beyond a reasonable doubt, that the defendant was guilty, as charged in the indictment, that they could find him guilty of murder in the first or second degree, or voluntary or involuntary manslaughter. Then followed a definition of the different degrees of murder and manslaughter. The form of the indictment was approved in *Hurd* v. *Commonwealth,* 159 Va. 880, 165 S. E. 536. The definition of murder in the first degree is substantially the same as set forth in Code, section 4393. The meaning of the language used is reasonably clear and free from objection.

The rulings of the court on instructions are made the basis of twenty-eight assignments of error. The court gave thirty-five instructions, nineteen on request of the Commonwealth, sixteen on request of the accused, and refused seventeen others offered by accused. To discuss separately each assignment would necessitate a dissertation on the law of homicide and serve no useful purpose. The fundamental error is found in instruction fourteen for the Commonwealth, reading thus:

"(14)

The court further instructs the jury that if you believe from the evidence beyond a reasonable doubt, that the door to the room in which T. E. Cornett, Virginia Bausell, and Jean Bausell were, was locked and that the defendant, Bernace Bausell, forcibly broke open said door, or aided, abetted and assisted Henry Bausell in so doing, and was entering the said room, with force and violence,

then the said T. E. Cornett, who was in the room, had the right to exercise all needful force to keep the aggressors, Bernace Bausell and Henry Bausell or either of them, out, even to the extent of taking their lives."

These instructions not only eliminate the right of self-defense, but in effect confine the verdict of the jury to that of murder in the first degree. They are in direct conflict with other instructions given for the accused. The Commonwealth admits this, and in the brief closes its discussion on the point thus: "Having admitted that Instructions Nos. 13 and 14 eliminate the right of self-defense, we are left in a dilemma. If we insist upon the correctness of these instructions, we must admit that the court erred in giving other instructions based upon the principle of law covering the right of self-defense. These instructions, and especially Instruction No. 14, given on behalf of the Commonwealth cannot be reconciled with the giving of any instruction at all upon the right of self-defense, or upon the question as to the degree of guilt of the accused."

However, we find no reversible error in the giving of Instruction No. 13. It is based upon the familiar principle that when one determines to commit a wrongful act, contemplates that another will, or may interfere with his enterprise, arms himself with a deadly weapon, with the intent to take the life of one who interferes, should it become necessary to save his own in the course of such interference, and in pursuance of such intent, does in fact take the life of the person so interfering, he is guilty of murder in the first degree. There is sufficient evidence in the record on which to base this instruction.

If, however, the jury believed that Henry Bausell acted in good faith when he took the Methodist minister to the Cornett home, for the purpose, as he stated, of bringing about a peaceful settlement of the difficulties existing between Virginia and his son; that following this visit they reported to the accused that they had made progress toward reconciliation; that the accused yielded to the per-

suasion of his father in making the trip, on the day of the tragedy, to the Cornett home, for the purpose of peacefully settling his marital difficulties, and that he armed himself merely for protection against an unprovoked attack, and that he shot only after Cornett had shot his father and turned the gun on him, then he is not guilty of murder in either degree. Such evidence, if believed by the jury, eliminates any preconceived design to use force in regaining possession of his daughter Jean, and establishes the lawful purpose of his presence at the Cornett home.

While the evidence on several crucial points is in conflict, if the jury had accepted the evidence introduced in behalf of the accused, their verdict could not have been murder in the first degree. Hence it becomes necessary even without the aid of the Attorney-General's view to reach a definite decision for the guidance of the trial court on another trial.

In the trial, the attorneys acting for the Commonwealth made only a general objection to all instructions given for the accused, no specific objection was made to the right of the accused to have the jury instructed on self-defense. The question squarely raised by the objection of the accused to the above instruction, is whether he was entitled to any instruction on self-defense, and if not, accepting his testimony as true, could the jury have consistently found him guilty of any crime less than murder in the first degree.

The accused had no legal right to force an entry into the upstairs bedroom, but under the circumstances narrated, the mere fact that he forced the door open, with no intent to commit any other crime, did not give Cornett the right to kill him.

In *State* v. *Taylor*, 143 Mo. 150, 44 S. W. 785, 787, the court said: "In a word it will be seen that defendant insists that, defendant's dwelling house being 'his castle,' he had a right to defend it from a trespass, even to the killing of deceased; that he had a right to take the life

of deceased because of the trespass upon the dwelling house alone, irrespective of the nature of the trespass, whether it was committed with a design to commit a felony thereon or therein or upon its inmates, or was a mere trespass upon the property. * * *

"* * * we deduce from the decided cases and the standard authors that a mere civil trespass upon a man's dwelling house does not justify him in slaying the trespasser; that the owner may resist the trespass, opposing force against force, but he has no right to kill unless it becomes necessary to prevent a felonious destruction of his property or the commission of a felony therein, or to defend himself against a felonious assault against his life or person; that if he kills without reasonable apprehension of immediate danger to his person or property, but in the heat of passion aroused by the trespasser, it will be manslaughter; but if one deliberately or premeditatedly kills another to prevent a mere trespass upon his property, whether that trespass could or could not otherwise be prevented, he is guilty of murder."

The owner may resist the entry, but he has no right to kill, unless it be rendered necessary to prevent loss of life or great bodily harm. If he kills where there is not a reasonable ground of apprehension of imminent danger to his person or property, it is manslaughter, and if done with malice, express or implied, it is then murder. Harrigan and Thompson's Criminal Defences, volume 1, page 963, note 861. See *Carroll* v. *State,* 23 Ala. 28, 58 Am. Dec. 282; *Pond* v. *People,* 8 Mich. 150; *Greschia* v. *People,* 53 Ill. 295; *Fortune* v. *Commonwealth,* 133 Va. 669, 688, 112 S. E. 861, overruling *Parrish* v. *Commonwealth,* 81 Va. 1.

There are two versions of the manner in which the bedroom door was forced open, and the action of the accused immediately following. The testimony of the witnesses for the Commonwealth tends to prove, that over the protest of Mrs. Clarke, the accused and his father, together, forced open the locked bedroom door, the ac-

cused rushed in and at once began the shooting which culminated in the death of two persons in the room. This constitutes murder in the first degree.

The evidence for the accused tends to prove that when he reached the hall upstairs, his father was already there talking to Virginia through the closed door. In his own words he said, "I went over to the door and just spoke to Jean, called her name through the door, and Jean began to beg her mother to see Bernie, and started to cry, and I hit the door with my shoulder and went in, and went over and picked Jean up * * *. My wife walked around me and shouted, 'Oh, Daddy, don't shoot.' About that time I heard the pistol shot. I set Jean down and whirled around, I saw Dad slump down; then he (Cornett) turned the gun on me. * * *. I had just pushed her (Jean) back out of fire, and that is where I got these two shots there (in his left arm) * * * I got my gun out as quick as I could and fired as fast as I could."

This evidence, in view of admitted facts, is not sufficient to entitle the accused to any instructions involving the principle of self-defense. Under the circumstances as narrated by the accused, his forcible entry into the bedroom was not a felony, but it was a trespass upon the habitation, which provoked the difficulty, and brought about the necessity for him to kill Cornett to preserve his own life. This constitutes manslaughter and not murder.

In 'Vaiden's Case (Vaiden v. Com.), 12 Gratt. (53 Va.) 717, 729, the principle is stated thus: "And with regard to the necessity that will justify the slaying of another in self-defense, it should seem that the party should not have wrongfully occasioned the necessity; for a man shall not in any case justify the killing of another by a pretense of necessity, unless he were without fault in bringing that necessity upon himself." See *Lamb's Case* (*Lamb* v. *Com.*), 141 Va. 481, 126 S. E. 3; *Sims' Case* (*Sims* v. *Com.*), 134 Va. 736, 115 S. E. 382; *Jackson's Case* (*Jackson* v. *Com.*), 98 Va. 845, 36 S. E. 487; *Clark's*

*Case* (*Clark* v. *Com.*), 90 Va. 360, 18 S. E. 440; *Honesty's Case* (*Honesty* v. *Com.*), 81 Va. 283.

While the principle is applied in each of the cases cited, there is no statement in any of them which contravenes the fact that the nature and character of the wrongful act which provoiked the difficulty, determine whether the accused is guilty of murder or manslaughter. In the case in judgment, the provocation, according to the evidence for the accused, was not an assault upon the person, but upon the habitation. In this class of cases the same principle applies, *i. e.,* the nature and character of the act, which provoked the difficulty and brought about the necessity to kill, to preserve the life of the accused, determine whether he is guilty of murder, or manslaughter.

"How far and to what extent he will be excused or excusable in law must depend upon the nature and character of the act he was committing, and which produced the necessity that he should defend himself. When his own original act was in violation of law, then the law takes that fact into consideration in limiting his right of defense and resistance whilst in the perpetration of such unlawful act. If he was engaged in the commission of a felony, and to prevent its commission, the party seeing it, or about to be injured thereby, makes a violent assault upon him, calculated to produce death or serious bodily harm, and in resisting such attack he slay his assailant, the law would impute the original wrong to the homicide, and make it murder. But if the original wrong was, or would have been, a misdemeanor, then the homicide growing out of, or occasioned by, it, though in self-defense from an assault made upon him, would be manslaughter * * *." *Reed* v. *State,* 11 Tex. App. 509, 40 Am. Rep. 795. See also, 13 R. C. L. 828; *State* v. *Larkin,* 250 Mo. 218, 157 S. W. 600, 46 L. R. A. (N. S.) 13.

The same distinction is drawn in 1 Harrigan and Thompson's Defences to Crime, page 227, where this is said:

"1. If he provoked the combat or produced the occasion, in order to have a pretext for killing his adversary or doing him great bodily harm, the killing will be murder, no matter to what extremity he may have been reduced in the combat.

"2. But if he provoked the combat or produced the occasion without any felonious intent—intending, for instance, an ordinary battery merely, the final killing in self-defense will be manslaughter only."

In *State* v. *Lance,* 94 Wash.484,488, 162 P.574,575, where the facts stated in the opinion are strikingly similar to evidence for the accused in the case in judgment, this is said, "* * * as there was evidence tending to show, the appellant intended to take the child at any hazard, armed himself with a revolver, went to the house of the person in whose custody the child was, and entered the house without warning with the revolver in his hand, his going was not lawful, he was wrongfully in the house, and he could not justify the killing of a person therein on a plea of self-defense, even if an assault was made upon him by such person, no matter how aggravated the assault may have been or how much he may have believed his life to be in danger. He was at least guilty of manslaughter, the crime of which he was convicted. As said by Mr. Wharton: 'If the defendant in any way challenged the fight, and went to it armed, he cannot afterward maintain that in taking his assailant's life he acted in self-defense.' 1 Wharton, Criminal Law (11th Ed.), section 613." See *King* v. *State,* 13 Tex. App. 277, 284; *Foutch* v. *State,* 95 Tenn. 711, 34 S. W. 423, 45 L. R. A. 687, and note.

■■ Applying these principles to the evidence introduced in behalf of the accused it follows that the trial court erred in giving Instruction No. 14, for the Commonwealth, and it likewise erred in giving for the accused any instructions on the right of self-defense. On a new trial the case should be submitted to the jury under appropriate instructions so drawn that they may find the accused guilty of murder, or manslaughter.

In the discussion of the principles of law applicable, it has been necessary to refer to some of the testimony in detail. In another trial no reference in the argument before the jury, should be made to the statements of this court on the testimony, as the jury must be left free to form their own conclusion as to the degree of the homicide from the sworn testimony of the witnesses, and to determine the punishment within the limits prescribed by statute.

For the reasons stated, the judgment of the trial court is reversed, the verdict of the jury set aside, and the case remanded for a new trial.

*Reversed and Remanded.*

Campbell, C. J., and Holt and Eggleston, JJ., dissenting.