COURT OF APPEALS OF VIRGINIA

Present: Judges Humphreys, O'Brien and Chaney
Argued at Lexington, Virginia


JAMES EDWARD FULTZ, IV

MEMORANDUM OPINION[*] BY
v.      Record No. 0189-22-3          JUDGE ROBERT J. HUMPHREYS
MAY 23, 2023

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF DANVILLE
James J. Reynolds, Judge

Samantha Offutt Thames, Senior Appellate Counsel (Virginia
Indigent Defense Commission, on briefs), for appellant.

Virginia B. Theisen, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


After a jury trial in the City of Danville Circuit Court, James Edward Fultz, IV, appeals

his convictions of first-degree murder and robbery. Fultz argues that the circuit court erred in

three ways: (1) in not dismissing a juror for cause, (2) in finding the evidence sufficient to

establish premeditation as required for the first-degree murder charge, and (3) in finding the

evidence sufficient to establish the temporal correlation between the violence or intimidation and

the intent to steal to support the robbery conviction.

BACKGROUND

I. Voir Dire of the Jury

Fultz elected to be tried by a jury. During voir dire of the jury pool, defense counsel

asked if anyone worked in law enforcement. Prospective juror number 10 ("Juror 10") answered

that he works at the juvenile detention home. Defense counsel and Juror 10 acknowledged that

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413.

they recognized each other from encounters at the juvenile detention home. Defense counsel asked, "Do you think that that would affect your ability to be fair and impartial here today?" Juror 10 replied, "Not really, I don't think so." Defense counsel continued, "You kind of waved your head there. Are you uncertain?" Juror 10 answered, "I'm uncertain but it shouldn't, no." Juror 10 was sent back to the jury room.

As voir dire continued, defense counsel made a motion to strike Juror 10 for cause. The court asked Juror 10 to return for more questioning. Defense counsel asked Juror 10 about the length of his employment at the juvenile detention home, and Juror 10 replied that he had worked there for twenty-five years. Defense counsel continued,

> And in that role, in that job, I think I asked you earlier, would that possibly affect your ability to make a fair and impartial decision here today, and you kind of shrugged or shook your head, and then I asked you, I followed up and you said you were uncertain, so I'll repeat the question, given that you've worked at the detention facility for some time and, and that's been your career, and you've had exposure to a lot of different circumstances there, do you believe that that may affect your ability to be fair and impartial in this jury today?

Juror 10 responded, "I'm still uncertain right now. I don't, you know, I don't want to say yes or no for sure." Asked why he feels uncertain, Juror 10 replied that he has encountered both the prosecutor and defense counsel through his employment.

The circuit court then stated that Juror 10 deals with pretrial and posttrial incarcerated juveniles. The court asked, "tell me how, as you understand the process of being a juror, tell me what you think your role is here in terms of evaluating the, the evidence." Juror 10 replied, "To seek the truth, basically. Seek the truth." Then the court asked Juror 10 how his experience in the criminal justice system would affect him in sitting as a juror. Juror 10 responded, "From my experience, you know, in dealing with juveniles, those cases and everything, I might tend to be a

little more judgmental on, on that part far as you know, whether the kid's guilty or innocent, and it might affect the, the case here. I'm not sure."

The prosecutor followed up, "When you say you may be more judgmental, I'm not quite sure . . . what you mean by that." The record indicates there was no audible response. The prosecutor said,

> Let me ask you this, this way, can you set aside, I mean, whatever contact you may have had with juveniles, set aside their story, set aside their case, and set aside whatever you may know in reference to the system and just base your verdict on the evidence and the law you hear today?

To which Juror 10 responded, "I could, yes." Juror 10 was then excused to the jury room.

Defense counsel argued that Juror 10 should be struck for cause because "he said that he would be judgmental." "I think that shows that he may have some prejudice towards my client's case from the outset, and he's been candid about that." The circuit court stated, "being judgmental doesn't mean he's inclined to be judgmental in favor of the Commonwealth." Defense counsel replied, "[T]he way I took what he expressed was to mean that he would be judgmental in favor of the Commonwealth . . . ."

The circuit court pointed out that Juror 10's responses to the Commonwealth's leading questions don't necessarily "make the grade" in rehabilitating the juror. However, the court denied defense counsel's motion to strike, stating,

> [N]ot being sure about being able to set aside, I don't think is grounds to be struck for cause. If you say I can't be fair, that's grounds for cause. . . . I think [Juror 10] is, is being candid. I don't think that he has expressed anything that the Court views as bias either towards or against either side and based on how I view his demeanor . . . and in response to the questions I asked him I believe he can be fair and . . . I don't believe there's a basis to strike him for cause . . . .

Defense counsel used a peremptory strike to exclude Juror 10 from the jury pool.

## II. Evidence at Trial

On Sunday, January 10, 2021, late in the afternoon, Fultz visited Rhonda Graham at her home, located at 503 Gay Street in Danville, Virginia.[1]  Elbert McCain showed up while Fultz was there.  Graham and McCain walked to a store to buy beer.  Fultz was still at the house when Graham and McCain returned about thirty minutes later.  Then, Delando Rodgers also arrived at Graham's house.  According to Fultz, these associates wanted him to find some drugs from local dealers he knew.  Rodgers found a phone number for a taxicab company, and Fultz called for a cab.  Soon thereafter, Graham heard a horn honk, looked out the window, and saw a cab.  She told Fultz his cab had arrived.  Prior to leaving Graham's house, Fultz asked Graham if she had a pair of sweatpants he could put on.  He left the house by himself, wearing a beige jacket and sweatpants pulled over his blue jeans.  Graham testified that Fultz did not return to the house that evening.

James Calloway was working as a dispatcher for Yellow Cab taxicab company on the evening of January 10.  That evening Calloway answered a call to the Yellow Cab phone number, and the caller requested a pickup at 503 Gay Street.  Calloway called cab driver Wendy Harris on her cell phone and dispatched her to 503 Gay Street.

About thirty minutes to one hour after dispatching Wendy, Calloway answered a call coming from Wendy's phone.  Over the phone, Calloway heard a male voice talking to Wendy— it was the same male voice he spoke with earlier in the evening, requesting a cab at 503 Gay Street.  Calloway heard the man say he wasn't "trying to do nothing crazy . . . or trying to hurt no one."  The man also said he was waiting for people to "bring the money out the house."  Calloway heard Wendy respond, "Why did you try to take my keys then . . . ?"  The man said, "So you won't go nowhere."  The phone call ended.

---

[1] Graham was a friend of Fultz's sister and had known Fultz for many years.

Calloway tried to call Wendy back several times. About five minutes later, his call was answered. No one was talking to Calloway, but he could hear Wendy and the same male voice talking. He heard Wendy say, "don't be hanging up my phone," and the man said, "she tripping, she tripping." Calloway called Wendy's name over the phone, but Wendy did not speak to him. The phone call ended. Calloway tried to call back, but no one answered. Calloway left his home in a cab to find out what was going on. About ten minutes after his last call to Wendy ended, Calloway spotted Wendy's cab at the intersection of Gay Street and Valley Street.[2] Calloway pulled up beside Wendy's cab and noticed her head was leaning against the glass of the driver's side door. Calloway drove a short distance away and called 911.

At 8:56 p.m. Officer J.C. Thornton of the Danville Police Department received a dispatch to 503 Gay Street. When he arrived, he found the Yellow Cab van and he could see that the driver of the van was slumped over in the seat and had multiple injuries. He opened the driver's door and checked the victim for a pulse; she had no pulse.

Officer G.B. Mayhew also arrived on the scene and spoke with Calloway who was waiting nearby in his car for the police to arrive. Sergeant S.C. Bray then approached 503 Gay Street and spoke with Graham, McCain, and Rodgers. A K-9 unit arrived on the scene. The dog tracked from the van to the porch of 503 Gay Street two times but did not alert on the front door, which would be expected to follow a scent of someone who entered through the door.

Around midnight, police contacted Shelby Holbert, Fultz's girlfriend. Police met Holbert at a business parking lot in Danville. An officer placed his cell phone in Holbert's vehicle, and several officers followed Holbert in a vehicle as she drove to meet Fultz. Holbert picked up Fultz, and the officers listened to Holbert and Fultz's conversation using another cell phone in

---

[2] Wendy's Yellow Cab van was parked on the corner of the intersection which was one house away from 503 Gay Street.

their vehicle.  An officer recorded the conversation with a body camera.  Over the cell phone, the officers heard Fultz say, two to three times, "I killed someone tonight."  Holbert drove a little farther and then pulled her car over to the side of the road.  The interior lights came on; Fultz exited the passenger side of the vehicle and ran.  Several officers chased Fultz on foot and arrested him in a nearby yard.  Officers backtracked on Fultz's path to see if he had thrown anything, and they only found a Dodge van owner's manual.

Officers investigating the crime scene found a clipboard splattered with blood in the back seat of the Yellow Cab van.  They also found a kitchen knife on a grassy hill next to Valley Street.  The Dodge owner's manual, the clipboard, and the knife all had Wendy's blood on them.  No cash was found on Wendy's person or in the van.

The knife belonged to Rhonda Graham; she testified that it came from her house.  The knife's blade was about seven inches long.  The medical examiner who performed the autopsy on Wendy concluded that the cause of her death was six stab wounds.  One stab wound to the posterior right shoulder area was seven inches deep and injured the vertebral column, softening the spinal cord itself.  This nerve damage may have prevented nerve signals from getting to her diaphragm and impaired her breathing.  Another stab wound behind Wendy's right ear was five inches deep and also injured her vertebral column and likely injured her spinal cord.  In Wendy's neck, a stab wound measured four inches deep and injured some ligaments on her vertebral column.  Near Wendy's right shoulder, a stab wound was seven inches deep, and on the front of her chest another stab wound was two inches deep.  She also had an incision wound to her face that "went through the entire thickness of her cheek and into her mouth."

Calloway testified that the paper on the clipboard found in the van was Wendy's Yellow Cab manifest.  He testified that Yellow Cab drivers keep one manifest per shift and record their trips on the manifest.  The cab drivers log how much money was charged for each trip on the

right-hand column. The company only accepts cash as payment for fares. At the end of the shift, the cab driver goes to the boss's house and there the cash is divided between the boss and the cab driver. Calloway testified that on January 10 he had dispatched Wendy to other calls before dispatching her to 503 Gay Street. Based on Wendy's manifest, she would have had cash from payments for trips that Calloway dispatched her to earlier in the evening. Totaling the night's fares listed on the manifest, Wendy should have had $30.75 in cash with her when she first arrived at 503 Gay Street.[3]

Defense counsel moved to strike the evidence. First, he argued that the first-degree murder charge should be reduced to second-degree murder, because the Commonwealth did not prove premeditation. Second, as to the robbery charge, he argued that there was no evidence that anything was taken from her person, and regarding the possible taking of the cab manual, the sequence of events is not clear and it would be speculation "as far as the robbery with taking the property of another by use of force."

After the circuit court denied the motion to strike, Fultz testified. He stated that he was trying to find drugs for the people at Graham's house. After he returned to Graham's house in the Yellow Cab van, he went inside Graham's house to get money. He came back out to speak with Wendy and to tell her he was still waiting on someone to bring him money. He saw the van manual on the ground and picked it up. He knocked on the van window and saw Wendy who did not respond; he saw blood and the van in disarray. Then he panicked and ran. He testified that he told Holbert that he killed Wendy because he felt responsible because she was killed while waiting for him to get money. He said he ran from the police because he does not trust them.

---

[3] On the same day as Wendy's murder, Fultz messaged a friend on Facebook saying that he was in trouble and he did not have any money.

Defense counsel again moved to strike the evidence, incorporating his earlier argument. The circuit court denied his motion, and the jury found Fultz guilty of first-degree murder and robbery.

## ANALYSIS

### I. Challenge to Juror 10

Fultz argues that "[t]he trial court erred in not striking juror 10 for cause." "It is prejudicial error for the trial court to force a defendant to use peremptory strikes to exclude a venireman from the jury panel if that person is not free from exception." *Townsend v. Commonwealth*, 270 Va. 325, 329 (2005) (citing *Breeden v. Commonwealth*, 217 Va. 297, 300 (1976)).

"Juror impartiality is a question of fact, and a trial court's decision to seat a juror is entitled to great deference on appeal." *Lovos-Rivas v. Commonwealth*, 58 Va. App. 55, 61 (2011) (internal citations omitted). "Whether a venireman can lay aside a preconceived opinion and render a verdict solely on the evidence is a mixed question of law and fact. Resolution of the question rests within the sound discretion of the trial court." *Calhoun v. Commonwealth*, 226 Va. 256, 258 (1983). This Court "must give deference to the circuit court's determination whether to exclude a prospective juror because that court was able to see and hear each member of the venire respond to questions posed." *Green v. Commonwealth*, 262 Va. 105, 115 (2001). "The circuit court is in a superior position to determine whether a prospective juror's responses during *voir dire* indicate that the juror would be prevented from or impaired in performing the duties of a juror as required by the court's instructions and the juror's oath." *Id.* "[T]he trial court must weigh the meaning of the answers given in light of the phrasing of the questions posed, the inflections, tone, and tenor of the dialogue, and the general demeanor of the

prospective juror." *Taylor v. Commonwealth*, 67 Va. App. 448, 455 (2017) (alteration in original) (quoting *Smith v. Commonwealth*, 219 Va. 455, 464-65 (1978)).

> [B]ecause the trial judge has the opportunity, which we lack, to observe and evaluate the apparent sincerity, conscientiousness, intelligence, and demeanor of prospective jurors first hand, the trial court's exercise of judicial discretion in deciding challenges for cause will not be disturbed on appeal, unless manifest error appears in the record.

*Jackson v. Commonwealth*, 267 Va. 178, 191 (2004) (quoting *Pope v. Commonwealth*, 234 Va. 114, 123-24 (1987)). "A manifest error occurs when the record shows that a prospective juror cannot or will not lay aside his or her preconceived opinion." *Taylor*, 67 Va. App. at 456.

"It is the duty of the trial court through the legal machinery provided for that purpose to procure an impartial jury to try every case." *Justus v. Commonwealth*, 220 Va. 971, 976 (1980) (quoting *Slade v. Commonwealth*, 155 Va. 1099, 1106 (1931)). Code § 8.01-358 provides that the court and counsel for either party have the right to ask prospective jurors "any relevant question to ascertain whether he is related to either party, or has any interest in the cause, or has expressed or formed any opinion, or is sensible of any bias or prejudice therein;" and "if it shall appear to the court that the juror does not stand indifferent in the cause, another shall be drawn or called and placed in his stead for the trial of that case." "The issue of who is, or is not, a competent juror is one for the trial court to decide, and in making its decision the court may exercise a reasonable discretion. Ordinarily, if that discretion has not been abused the trial court's decision on that matter is final." *Justus*, 220 Va. at 976 (quoting *Slade*, 155 Va. at 1106).

"The opinion entertained by a juror, which disqualifies him, is an opinion of that fixed character which repels the presumption of innocence in a criminal case, and in whose mind the accused stands condemned already." *Id.* (quoting *Slade*, 155 Va. at 1106). "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to

- 9 -

establish an impossible standard." *Briley v. Commonwealth*, 222 Va. 180, 186 (1981) (quoting *Irvin v. Dowd*, 366 U.S. 717, 723 (1961)) (providing examples of jurors' fixed opinions or partiality requiring strike for cause). "It is not uncommon to discover during *voir dire* that prospective jurors have preconceived notions, opinions, or misconceptions about the criminal justice system, criminal trials and procedure, or about the particular case." *Griffin v. Commonwealth*, 19 Va. App. 619, 621 (1995). "Even though a prospective juror may hold preconceived views, opinions, or misconceptions, the test of impartiality is whether the venireperson can lay aside the preconceived views and render a verdict based solely on the law and evidence presented at trial." *Id.* "A prospective juror who is biased, prejudiced, or who 'persists in a misapprehension of law that will render him incapable of abiding [by] the court's instructions and applying the law, must be excluded for cause' because such a juror cannot be impartial." *Id.* (quoting *Sizemore v. Commonwealth*, 11 Va. App. 208, 211 (1990)).

On one hand "a casual impression" does not necessarily disqualify a prospective juror, while on the other hand, "a fixed and abiding conviction" must disqualify a prospective juror. *See Huguely v. Commonwealth*, 63 Va. App. 92, 123 (2014) (quoting *Briley*, 222 Va. at 185). A "prospective juror's entire *voir dire* must be considered—not just isolated portions," *id.* at 123— to determine the juror's mental attitude, *Bausell v. Commonwealth*, 165 Va. 669, 676 (1935).

Fultz and the dissent rely on the case of *Brown v. Commonwealth*, 29 Va. App. 199 (1999), to support their position that Juror 10 was not impartial. Brown moved the trial court to strike three prospective jurors for cause, and the trial court denied his motion. *Id.* at 202. Brown was on trial for attempted rape and abduction, among other charges. *Id.* During voir dire, "Juror No. 1 stated that she had been a victim of an attempted abduction and a possible attempted sexual assault . . . ." *Id.* at 203-04. When asked if her experience would give her "a bias in this case either for or against," she replied, "I don't honestly know. I would hope not." *Id.* at 204.

- 10 -

Asked if she would keep an open mind and decide the case based solely on the evidence, she replied, "We would all try to do that." *Id.* Other responses included, "I think that I would be fair as a juror. That's the best that I can respond." *Id.* at 205. Then she said she was not sure and didn't see how she could be sure because she was "not clairvoyant." *Id.* After a question of whether she would consider only the evidence and completely put out of her mind her personal experience, she said, "I think that I would. I would do my best to. I mean I've never been in that situation before . . . there may be feelings there that would not influence me, but there might be feelings there nonetheless." *Id.* "I would hope that I would do my duty and really look at the evidence." *Id.*

This Court noted that the prospective juror "expressed numerous reservations about her ability to serve impartially on the jury in light of her personal experiences," and "[n]early all of [her] responses contained the phrases, 'I think,' 'I don't know,' and 'I would try.'" *Id.* at 208. This Court found that the trial court erred in refusing to strike the prospective juror for cause because her responses indicated a great degree of equivocation and created reasonable doubt about her fitness to serve as a juror, and such doubt "must be resolved in favor of the accused." *Id.*

The Commonwealth points us to *Weeks v. Commonwealth*, 248 Va. 460 (1994), where the Supreme Court concluded that the circuit court was justified in finding that the potential juror could be impartial during trial. *Id.* at 475. The defendant, on trial for murdering a police officer, argued that the juror should be struck for cause because the juror stated that he is affected by the fact that his close family member who was a police officer was killed in a drug shootout. *Id.* at 474. The Court noted that the juror answered many questions that "reflected his ability to serve as an impartial juror." *Id.* at 475. And when asked by the prosecutor whether he could set aside anything in the past and be fair to both parties in this matter, the juror answered, "I think so." *Id.*

The Court stated its duty was "to defer to the trial judge" to interpret the juror's answer based on the emphasis he placed on the words as he answered.  *Id.*  "On appeal, we must presume he emphasized 'so.'"  *Id.*

Here, Juror 10 expressed some uncertainty about how his experiences in the criminal justice system might affect his impartiality as a juror, but he did not indicate that he had fixed opinions or biases that he would not lay aside.  Fultz argues, and the dissent concludes, that Juror 10's statement that he may be "a little more judgmental" meant that he would hold bias against Fultz.  Juror 10's full statement was that he "might tend to be a little more judgmental . . . far as [sic] . . . whether the kid's guilty or innocent, and it might affect the . . . case here.  I'm not sure." This statement on its face does not show bias against Fultz, but rather indicates Juror 10 planned to judge whether Fultz was guilty or innocent.  Furthermore, Juror 10 offered in his own words that his role as a juror would be to seek the truth.  The circuit court observed Juror 10's demeanor as he answered questions.  This Court gives deference to the circuit court's decision regarding whether to strike a potential juror for cause.  When viewed in the light most favorable to the Commonwealth, Juror 10's entire voir dire supports the circuit court's conclusion that Juror 10 did not express fixed bias either towards or against either party and that he could be fair.[4]  On this record, the circuit court did not commit manifest error in refusing to strike Juror 10 for cause.

---

[4] Fultz argues that Juror 10 demonstrated bias against him and was not properly rehabilitated.  He cites the principle that where a juror has declared a bias in favor of a party, the evidence used to rehabilitate the juror must come from the juror; a juror's mere assent to leading questions will not suffice to rehabilitate the juror.  *David v. Commonwealth*, 26 Va. App. 77, 81 (1997).  Because we find that Juror 10 did not declare a bias in favor of a party, we do not need to address whether he was sufficiently rehabilitated.

## II. Sufficiency of the Evidence

"When considering on appeal the sufficiency of the evidence presented below, we 'presume the judgment of the trial court to be correct' and reverse only if the trial court's decision is 'plainly wrong or without evidence to support it.'" *Kelly v. Commonwealth*, 41 Va. App. 250, 257 (2003) (en banc) (quoting *Davis v. Commonwealth*, 39 Va. App. 96, 99 (2002)). "Thus, we do not 'substitute our judgment for that of the trier of fact.'" *Id.* (quoting *Wactor v. Commonwealth*, 38 Va. App. 375, 380 (2002)). "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* at 257-58 (quoting *Jackson*, 443 U.S. at 319).

## A. First-Degree Murder

Fultz argues that the evidence in his case was insufficient to prove premeditation. Premeditated murder "contemplates: (1) a killing; (2) a reasoning process antecedent to the act of killing, resulting in the formation of a specific intent to kill; and (3) the performance of that act with malicious intent." *Rhodes v. Commonwealth*, 238 Va. 480, 486 (1989). "Premeditation and formation of an intent to kill seldom can be proved by direct evidence. A combination of circumstantial factors may be sufficient." *Id.* "The intent to kill must come into existence at some time before the killing; it need not exist for any particular length of time." *Epperly v. Commonwealth*, 224 Va. 214, 231 (1982) (quoting *Smith v. Commonwealth*, 220 Va. 696, 700 (1980)). "A design to kill may be formed only a moment before the fatal act is committed, provided the accused had time to think and did intend to kill." *Id.* (quoting *Giarratano v.*

*Commonwealth*, 220 Va. 1064, 1074 (1980)).  "[W]e will affirm a conviction of premeditated murder . . . whenever we can say that the reasonable import of such evidence, considered as a whole, is sufficient to show beyond a reasonable doubt that the accused was the criminal agent and that he acted with a premediated intent to kill."  *Rhodes*, 238 Va. at 487.

Fultz took a kitchen knife from Graham's house with him when he entered the cab.  It is a fair inference that he took the knife to the cab with an intent to use it as a weapon—it would be an unusual item to carry along otherwise.  It is also a fair inference that Fultz was planning to protect his clothes from a bloody mess when he asked Graham for some sweatpants he could put on over his jeans before he went to the cab.  Moreover, the six stab wounds inflicted on Wendy, some seven inches deep, indicated a specific intent to kill.  "[I]t is permissible for the fact finder to infer that every person intends the natural, probable consequences of his or her actions."  *Secret v. Commonwealth*, 296 Va. 204, 229 (2018) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 330 (2018)).  The natural and probable consequences of Fultz's actions—repeatedly and severely stabbing Wendy in her head, on the front and back of her torso, and towards her spinal column—was that Wendy would die.  Based on the evidence, it was entirely rational for the jury to find that Fultz had premeditated intent to kill Wendy.  Thus, the circuit court did not err in denying Fultz's motion to strike the first-degree murder charge.

### B.  Robbery

Fultz argues that the evidence was insufficient to prove "the necessary temporal correlation between the elements of the crime."  He asserts there is "no evidence that the taking of the money, and/or the leather folder and car manual, was contemplated at or before the time of the murder."

"The common-law crime of robbery is defined as the taking of the personal property of another, with the intent to steal, from his person or in his presence, and against his will, by

violence or intimidation." *Patterson v. Commonwealth*, 222 Va. 653, 664 (1981). "The violence, in order to constitute an element of robbery, must precede or be concomitant with the appropriation of the property from the person or presence of the owner." *Id.*

The evidence adduced at trial showed that on the day of Wendy's murder, Fultz told a friend on Facebook that he was in trouble and did not have any money. The circumstantial evidence supports a finding that Wendy had cash in the van—she was driving a cab that only collected cash for payment, she had driven other customers during that shift, and the company practice was to settle money between the cab driver and boss at the end of the shift. Yet, no money was found on Wendy or in the van. The jury could reasonably infer that Fultz, who entered the van with a kitchen knife, had prepared to kill the cab driver to take any money he could find in her presence. The evidence supports a finding that Fultz killed Wendy and concomitantly took the cash she had collected in fares that evening. Therefore, the circuit court did not err in denying Fultz's motion to strike the robbery charge.

For the foregoing reasons, the judgment of the circuit court is affirmed.

*Affirmed.*

Chaney, J., dissenting.

The jury that convicted appellant, James Edward Fultz, IV (defendant), was selected from a venire that included a prospective juror (Juror 10) who was not free from partiality and prejudice beyond a reasonable doubt, in violation of defendant's constitutional right to a fair and impartial jury. *See* U.S. Const. amend. VI; Va. Const. art. I, § 8.[5] "[I]t is prejudicial error . . . to force a defendant to use the peremptory strike . . . to exclude a venireman who is not free from exception." *Brown v. Commonwealth*, 29 Va. App. 199, 203 (1999) (quoting *Scott v. Commonwealth*, 1 Va. App. 447, 451 (1986)). Because it was manifest error for the trial court to deny defendant's motion to strike Juror 10 for cause, I would reverse the convictions and remand to the trial court for further proceedings. Therefore, I dissent from the majority's opinion affirming defendant's convictions.

"[A]ll doubts about the fitness of a juror to serve must be resolved in favor of the accused . . . ." *Id.* at 208. Juror 10 raised reasonable doubts about his fitness as a juror when he repeatedly expressed uncertainty about whether his experience in law enforcement—25 years ongoing employment at an incarceration facility for juveniles—would affect his ability to be a fair and impartial juror. When asked in voir dire whether his law enforcement experience would affect his ability to be fair and impartial in defendant's trial, Juror 10 initially answered, "Not really, I don't think so." After observing, "You kind of waved your head there," defendant's counsel inquired of Juror 10, "Are you uncertain?" Juror 10 responded, "I'm uncertain but it shouldn't, no."

Juror 10's additional responses during voir dire did not dispel the doubts raised about his fitness to serve as a juror in defendant's trial. After defendant moved to strike Juror 10 for cause, Juror 10 was again asked whether his career working at an incarceration facility "may affect [his]

---

[5] The constitutional right to a fair and impartial jury under the United States Constitution and Virginia Constitution is reinforced by Code § 8.01-357 ("a [jury] panel free from exceptions shall be obtained"), Code § 8.01-358, and Rule 3A:14(b).

ability to be fair and impartial in this jury today?" Juror 10 answered, "*I'm still uncertain* right now. I don't, you know, I don't want—to say yes or no for sure." (Emphasis added). In response to the trial court's subsequent questions, Juror 10 acknowledged that a juror's role in evaluating the evidence was "to seek the truth," "to weigh the testimony that they hear," and "decide . . . whether the Commonwealth has proven its case beyond a reasonable doubt." Then the trial court asked Juror 10 how he would be affected in performing the role of juror given his "background information in terms of experience . . . about the criminal justice system . . . ." Juror 10 answered:

> From my experience, you know, in dealing with juveniles, those
> cases and everything, I might tend to be a little more judgmental on,
> on that part far as you know, whether the kid's guilty or innocent,
> *and it might affect the, the case here. I'm not sure.*

(Emphasis added). After Juror 10 admitted that the trial might be affected by his possible tendency to be more judgmental about whether an incarcerated juvenile is guilty or innocent, the Commonwealth's attorney attempted to rehabilitate Juror 10 by asking the following leading question:

> [C]an you set aside, I mean, whatever contact you may have had with
> juveniles, set aside their story, set aside their case, and set aside
> whatever you may know in reference to the system and just base
> your verdict on the evidence and the law you hear today?

Juror 10 answered, "I could, yes." But such "mere assent to leading questions" is insufficient to rehabilitate a prospective juror whose "responses during *voir dire* created a reasonable doubt as to [his] qualification to serve as a fair and impartial juror." *DeLeon v. Commonwealth*, 38 Va. App. 409, 413 (2002). "The evidence used to show the requisite qualifications must emanate from the juror [him]self, unsuggested by leading questions posed to [him]." *Id.* (quoting *David v. Commonwealth*, 26 Va. App. 77, 81 (1997)). As the trial court acknowledged on the record, "the case law is replete with . . . a juror who answers in response to a leading question and says yes, that doesn't necessarily make the grade."

- 17 -

Considering the entire voir dire, Juror 10's responses during voir dire failed to establish beyond a reasonable doubt that he could serve as a fair and impartial juror in defendant's case. Juror 10 repeatedly stated that he was "uncertain" or "not sure" whether his law enforcement experience would affect his ability to be a fair and impartial juror. In contrast, Juror 10 definitively responded that he would not be affected at all by his expectation of post-trial interactions with the parties' attorneys. Juror 10 also admitted that his possible tendency to be judgmental about the incarcerated juveniles at his workplace might affect defendant's case. As the trial court acknowledged, Juror 10's last answer in voir dire—affirming that he could set aside his work experience and knowledge of the criminal justice system and base his verdict on the evidence and the law—was mere assent to the Commonwealth's leading question. Considering all of Juror 10's responses in voir dire, Juror 10's own lack of certainty and confidence in his ability to be a fair and impartial juror raised a reasonable doubt about whether he could be free from partiality and prejudice in determining whether the Commonwealth proved all the elements of the charged offenses beyond a reasonable doubt.

The trial court erred in finding no grounds to strike Juror 10 for cause, notwithstanding the court's finding that Juror 10 was unsure whether his law enforcement experience affected his ability to be a fair and impartial juror in defendant's case. The trial court ruled "not being sure about being able to set aside [his law enforcement experience], I don't think is grounds to be struck for cause. If you say I can't be fair, that's grounds for cause." However, contrary to the trial court's ruling, Juror 10's uncertainty about his ability to be fair was cause to exclude him from the jury because it raised reasonable doubt about his qualification to serve as a fair and impartial juror. *See Brown*, 29 Va. App. at 208 (holding that a prospective juror's own "reservations about her ability to serve impartially on the jury in light of her personal experiences . . . created reasonable doubt about her fitness as a juror"). Such "reasonable doubt regarding the prospective juror's ability to give the

accused a fair and impartial trial must be resolved in favor of the accused." *Id*. at 203 (quoting *Gosling v. Commonwealth*, 7 Va. App. 642, 645 (1989)).  Therefore, it was manifest error for the trial court to deny defendant's motion to strike Juror 10 for cause.  *See DeLeon*, 38 Va. App. at 413 ("hold[ing] that the trial court's refusal to grant appellant's motion to strike [a prospective juror] for cause constituted manifest error" where her "responses during *voir dire* created a reasonable doubt as to her qualification to serve as a fair and impartial juror").  Because such error is not harmless, defendant's convictions should be reversed.  *See id.*